# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| CORETEL AMERICA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. N21C-10-103 AML CCLD |
| | ) |
| OAK POINT PARTNERS, LLC, | ) |
| | ) |
| Defendant. | ) |

Submitted: April 28, 2022
Decided:  July 21, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Defendant Oak Point Partners, LLC's Motion to Dismiss*
**GRANTED IN PART, DENIED IN PART**

Michael L. Vild, Esq., Cross & Simons, LLC, Wilmington, DE; Matthew D. Kohel, Esq., Saul Ewing Arnstein & Lehr LLP, Baltimore, MD, *Counsel for Plaintiff CoreTel America, Inc.*

Joseph B. Cicero, Esq., Elliot Covert, Esq., Chipman Brown Cicero & Cole, LLP, Wilmington, Delaware, *Counsel for Defendant Oak Point Partners, LLC*

**LeGrow, J.**

This dispute concerns competing claims of ownership to a group of IP addresses called the 162.33.0.0/16 Block. Plaintiff contends it acquired rightful ownership of the 162.33.0.0/16 Block through a series of transactions between Plaintiff's affiliates and a since-bankrupt third-party company that previously owned the 162.33.0.0/16 Block. The third party allegedly transferred the 162.33.0.0/16 Block to Plaintiff's affiliate in 1999, and Plaintiff and its affiliates took various steps to use and control the 162.33.0.0/16 Block after that time.

The third-party transferor declared bankruptcy in May 2015. Defendant purchased certain assets from the bankruptcy estate, which Defendant claims included the 162.33.0.0/16 Block. Although Plaintiff disputed Defendant's claim of ownership, Defendant purportedly sold the 162.33.0.0/16 Block to an unrelated third party in May 2021.

Plaintiff filed its six-count Complaint in this Court in October 2021, seeking "money damages and other relief, arising from, *inter alia*, Defendant's conversion, other tortious behavior, unjust enrichment, and deceptive conduct, including Defendant's false claims of ownership, and improper use and disposition of Plaintiff's assets that are worth millions of dollars."[1] Defendant moved to dismiss all those claims for failure to state a claim.[2]

---

[1] Compl. at ¶ 1 (D.I. 1).
[2] Oak Point's Mot. to Dismiss (D.I. 11).

1

Among the key issues raised in Defendant's motion are questions of (i) what Plaintiff must plead to support a reasonably conceivable property and possessory interest in the 162.33.0.0/16 Block in order to sustain its claims for declaratory judgment and conversion; (ii) whether Plaintiff's allegation that it expected to enter into an agreement to allow a broker to sell the Block is sufficient to plead claims for unfair competition or interference with prospective business relations; and (iii) whether the absence of any claim for injunctive relief defeats Plaintiff's deceptive trade practices claim.

For the reasons explained below, the Motion is **GRANTED** as to Plaintiff's deceptive trade practices and unjust enrichment claims (Counts III and VI). The Motion is **DENIED** as to the conversion claim (Count I), the common law unfair competition claim (Count II), the tortious interference claim (Count IV), and the declaratory judgment claim (Count V).

## I. BACKGROUND

### A. Parties

Plaintiff CoreTel America, Inc. ("CoreTel America") is a Delaware corporation that maintains offices in South Carolina.[3] CoreTel America is one company within a family of companies that provides telecommunications services

---

[3] Compl. at ¶ 32.

in the mid-Atlantic region.[4]  CoreTel America is a subsidiary of CoreTel Communications, Inc. ("CoreTel"), as is Core Communications, Inc. ("Core Communications").[5]  Defendant Oak Point Partners, LLC ("Oak Point") is a Delaware limited liability company with offices in Illinois.[6]

## B. IP addresses and the 162.33.0.0/16 Block

Internet Protocol ("IP") addresses are a series of numbers that are assigned to devices that connect to computer networks over the internet.[7]  An IP address identifies a network-connected device and provides an "address" to which to send communications.[8]  The 162.33.0.0/16 Block consists of a type of IP address known as Internet Protocol version 4, or IPv4.[9]  An IPv4 address is four numbers, each of which range from 0 to 255 separated by periods.[10]  The amount of available IPv4 addresses is finite, with approximately four billion IPv4 addresses that can be assigned at any time.[11]

Today, the administration of IPv4 addresses is overseen by the American Registry for Internet Numbers ("ARIN").[12]  ARIN is a non-profit, member-based

---

[4] *Id.* at ¶ 2.
[5] *Id.* at ¶¶ 3–4.
[6] *Id.* at ¶ 33.
[7] *Id.* at ¶ 6.
[8] *Id.*
[9] *Id.* at ¶ 8.
[10] *Id.* at ¶ 9.
[11] *Id.* at ¶ 10.
[12] *Id.* at ¶ 11.

organization and the regional internet registry for the United States.[13] IPv4 addresses assigned before ARIN's formation in 1997 are called "legacy addresses."[14] According to CoreTel America, the owners of legacy IPv4 addresses have not entered into any binding legal agreement that limits their rights to use, transfer, or maintain legacy addresses.[15] "Stated differently, ARIN does not have authority over the use, ownership, and transfer of legacy IPv4 addresses."[16] By contrast, non-legacy IPv4 addresses were assigned after ARIN's formation and are subject to contractual limitations on their use and transferability.[17]

The growth of the Internet has reduced the number of unallocated and available IPv4 addresses.[18] As a result, blocks of IPv4 addresses have become valuable commodities that are sold in private transactions and at auction.[19] CoreTel America claims the 162.33.0.0/16 Block, which consists of 65,536 legacy IPv4 addresses, is worth at least $3 million under 2021 auction values.[20]

**C. CoreTel America allegedly acquires the 162.33.0.0/16 Block**

In November 1999, Core Communications allegedly entered into an agreement with RCC Consultants, Inc. ("RCC"), then-owner of the 162.33.0.0/16

---

[13] *Id.* at ¶ 12.
[14] *Id.* at ¶¶ 12–13.
[15] *Id.* at ¶ 13.
[16] *Id.* at ¶ 14.
[17] *Id.* at ¶ 16.
[18] *Id.* at ¶ 18.
[19] *Id.* at ¶ 21.
[20] *Id.* at ¶¶ 24–25.

Block.[21]  Under this agreement, Core Communications provided internet bandwidth at no cost to RCC in exchange for RCC transferring all its rights, title, and interest in the 162.33.0.0/16 Block to Core Communications.[22]

CoreTel America has not identified a formal contract documenting this agreement.  But, on November 29, 1999, RCC's Vice President, Scott Galbraith, sent an email to an RCC engineer named Hector Gonzalez.  Mr. Galbraith asked whether Mr. Gonzalez got "the router up there changed to announce the correct domain address range?"[23]  In response, Mr. Gonzalez gave Core Communications "operational control" of the 162.33.0.0/16 Block and affirmed in an email that he had done so.[24]  According to CoreTel America, "[t]hese emails document the agreement between Core Communications and RCC and demonstrate that RCC transferred ownership, use, and control of the 162.33.0.0/16 Block to Core Communications."[25]

Core Communications then attached the 162.33.0.0/16 Block to its routers and announced the IP addresses to its border gateway protocol peers.[26]  Furthermore, Core Communications began "sub-utilization" of the 162.33.0.0./16 Block to certain

---

[21] *Id.* at ¶¶ 5, 40.
[22] *Id.* at ¶¶ 39.
[23] *Id.* at ¶ 42.
[24] *Id.*
[25] *Id.*
[26] *Id.* at ¶ 43.

wholesale customers of its parent company, CoreTel.[27] Core Communications used the 162.33.0.0/16 Block primarily for CoreTel's digital subscriber line customers, but also sold dialup "managed modem" services wholesale as a competitive local exchange carrier.[28]

On August 1, 2003, Core Communications assigned its entire right, title, and interest in the 162.33.0.0/16 Block to CoreTel Communications.[29] That same day, CoreTel Communications transferred its entire right, title, and interest in the 162.33.0.0/16 Block to CoreTel America as part of CoreTel Communications' corporate restructuring.[30] Since then, CoreTel America has "openly and continuously" used the 162.33.0.0/16 Block to handle several millions of dollars' worth of telecommunications services for its customers.[31]

## D. RCC declares bankruptcy

In 2015, RCC filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.[32] RCC filed schedules setting forth its assets on May 15, 2015.[33] According to CoreTel America, "[t]he only property schedule on which RCC could have listed the

---

[27] *Id.*
[28] *Id.* at ¶ 44.
[29] *Id.* at ¶ 45.
[30] *Id.* at ¶¶ 28, 45–46.
[31] *Id.* at ¶ 47.
[32] *Id.* at ¶¶ 49, 51.
[33] *Id.* at ¶ 51.

6

162.33.0.0/16 Block would have been Schedule B, the personal property schedule."[34]  RCC, however, did not list the 162.33.0.0/16 Block on its Schedule B.[35]  CoreTel America claims RCC did not declare the 162.33.0.0/16 Block as one of its assets during its bankruptcy proceeding "because RCC did not own the 162.33.0.0/16 Block after its November 1999 agreement [with] Core Communications."[36]

On July 31, 2015, the Bankruptcy Court issued an order authorizing and approving the sale of substantially all of RCC's assets to a company called Black & Veatch Corporation ("B&V").[37]  As part of the sale, the Bankruptcy Court approved an Asset Purchase Agreement (the "APA") with RCC as the seller and B&V as the buyer.[38]  The APA did not identify the 162.33.0.0/16 Block as one of the assets being sold.[39]  The APA, however, listed one of the assets being sold as "registered domain names (including the website address, 'www.rcc.com.')."[40]  According to CoreTel America, "[t]his shows that had RCC considered the 162.33.0.0/16 Block to be one of its assets when it filed bankruptcy or when it entered into the B&V APA, it knew

---

[34] *Id.* at ¶ 52.
[35] *Id.*
[36] *Id.* at ¶ 57.
[37] *Id.* at ¶ 58.
[38] *Id.* at ¶ 59.
[39] *Id.* at ¶ 60.
[40] *Id.* at ¶ 61.

how to identify internet addresses and intangible assets with specificity."[41]  B&V subsequently abandoned its ownership of the www.rcc.com domain name.[42]

Around March 2017, CoreTel America learned RCC had filed for bankruptcy.[43]  At that time, the ARIN registry still listed RCC as the point of contact for the 162.33.0.0/16 Block.[44]  On March 17, 2017, Bret Mingo, CoreTel America's CEO, incorporated a company in Wyoming named "RCC Consultants, Inc" and leased the "rcc.com" domain in order to change the contact information and identify CoreTel America as owner of the 162.33.0.0/16 Block.[45]  Additionally, CoreTel America purchased the domain "rcconsultants.net" and had ARIN change the point of contact information for this website to Mr. Mingo's name, address, and telephone number.[46]  According to CoreTel America, these measures "provide[d] notice to the world that CoreTel America had administrative control over the 162.33.0.0/16 Block" and "provide[d] additional evidence of CoreTel America's control over and ownership of the internet-based assets that were not acquired by B&V from RCC under the APA."[47]

---

[41] *Id.* at ¶ 10
[42] *Id.* at ¶ 63.
[43] *Id.* at ¶ 64
[44] *Id.* at ¶ 65.
[45] *Id.* at ¶ 66.
[46] *Id.* at ¶ 67.
[47] *Id.* at ¶ 69.

Non-party Hilco Steambank ("Hilco") acts as a broker for the purchase and sale of IPv4 addresses.[48]  Hilco conducts sales through privately negotiated transactions for larger blocks and through its online platform for smaller blocks.[49] CoreTel America retained Hilco to act as its broker to sell various IPv4 addresses in December 2015.[50]  In retaining Hilco as its broker, CoreTel America and Hilco entered into a written agreement and non-disclosure agreement.[51]

In January 2017, CoreTel America approached Hilco about selling at least a portion of the 162.33.0.0/16 Block.[52]  Because RCC's bankruptcy proceedings were still ongoing, CoreTel America decided to wait for three years—until 2020—to sell the 162.33.0.0/16 Block in case another party asserted a claim on it.[53]

**E. Oak Point purportedly acquires the 162.33.0.0/16 Block**

Eventually, "Jack Hazan"—who CoreTel America implies is a Hilco employee—"and/or Hilco got tired of waiting for CoreTel America to sell the 162.33.0.0/16 Block and contacted Oak Point and made it aware of the RCC bankruptcy proceeding and/or the 162.33.0.0/16 Block."[54]  On August 6, 2019, Oak Point entered into an asset purchase agreement with the liquidating trust of RCC's

---

[48] *Id.* at ¶ 71.
[49] *Id.*
[50] *Id.* at ¶ 72.
[51] *Id.*
[52] *Id.* at ¶ 73.
[53] *Id.* at ¶ 74.
[54] *Id.* at ¶ 76.

9

bankruptcy estate to acquire the "so-called remnant assets" remaining in the estate (the "Remnant APA").[55] Oak Point contends the 162.33.0.0/16 Block was a remnant asset and that Oak Point acquired the 162.33.0.0/16 Block by virtue of the Remnant APA.[56] Additionally, Oak Point caused ARIN to register it as the owner and/or point of contact of the 162.33.0.0/16 Block.[57]

At an unspecified time in 2020, CoreTel America advised Oak Point that CoreTel America owned the 162.33.0.0/16 Block.[58] In response to CoreTel America's claim of ownership, Oak Point provided CoreTel America a copy of the Remnant APA in or about the summer of 2020.[59]

In May 2020, Mr. Hazan contacted CoreTel America and offered to broker a deal under which Oak Point would sell the 162.33.0.0/16 Block to CoreTel America.[60] On July 16, 2020, Mr. Hazan sent an email to Mr. Mingo explaining: "Basically, Oak Point bought the remaining assets of RCC out of bankruptcy, so Oak Point owns whatever rights RCC has in the addresses."[61] CoreTel America alleges "Oak Point could not have known about the 162.33.0.0/16 Block but for being made aware of it by Jack Hazan and/or Hilco" because it "was not identified in RCC's

---

[55] Id. at ¶ 77.
[56] Id. at ¶¶ 79–83.
[57] Id. at ¶ 87.
[58] See id. at ¶ 79.
[59] Id. at ¶ 80.
[60] Id. at ¶ 88.
[61] Id. at ¶ 90.

bankruptcy proceeding as an asset of RCC and/or RCC's bankruptcy estate."[62] CoreTel America therefore alleges "Jack Hazan tipped Oak Point off about the 162.33.0.0/16 Block so that Hilco could act as a double-agent . . . and profit from brokering both sides of a potential transaction" regarding the 162.33.0.0/16 Block.[63]

On May 21, 2021, ARIN changed the registration for the 162.33.0.0/16 Block from Oak Point to a company named FastTrack Communications Inc ("FastTrack").[64] The complaint alleges FastTrack purchased the 162.33.0.0/16 Block from Oak Point, and Oak Point and/or FastTrack caused ARIN to register the 162.33.0.0/16 Block in FastTrack's name.[65]

### F. Litigation

CoreTel America filed its Complaint on October 13, 2021. In Count I, CoreTel America alleges "Oak Point's knowing and intentional taking, retention, use, and any attempts to profit from, and/or sell, license, transfer, convey or dispose of the 162.33.0.0/16 Block without CoreTel America's authorization constitutes conversion."[66]

In Count II, CoreTel America alleges Oak Point engaged in common law unfair competition by "prevent[ing] CoreTel America from legitimately earning

---

[62] *Id.* at ¶ 91.
[63] *Id.* at ¶ 95.
[64] *Id.* at ¶ 97.
[65] *Id.*
[66] *Id.* at ¶ 106.

11

revenue from the 162.33.0.0/16 Block" under a sale brokered by Hilco.[67] Similarly, in Count III, CoreTel claims Oak Point is liable for unfair competition under Delaware's Deceptive Trade Practices Act ("DTPA") for causing ARIN to register the 162.33.0.0/16 Block in Oak Point's name, thereby interfering with CoreTel America's relationship with Hilco and opportunity to sell the Block for a profit.[68] Relying on similar allegations, Count IV is a claim for tortious interference with prospective economic advantage, alleging Oak Point "intentionally and wrongfully" interfered with CoreTel America's business relationship with Hilco relating to a potential sale of the 162.33.0.0/16 Block.[69]

Count V seeks declaratory judgment to the effect that: (1) "CoreTel America acquired all rights, title, and interest in and to the 162.33.0.0/16 Block from RCC under their November 1999 agreement;" (2) "Oak Point did not acquire the 162.33.0.0/16 Block from RCC, RCC's bankruptcy estate, the Liquidating Trust, and/or under the Remnant APA;" and (3) CoreTel America "is the legal and/or equitable owner, and/or has other interests in the 162.33.0.0/16 Block, including but not limited to, the IP addresses within the 162.33.0.0/16 Block that have not been sold, licensed, transferred, conveyed, or otherwise disposed of by Defendant."[70]

---

[67] *See id.* at ¶¶ 108–15.
[68] *See id.* at *Id.* at ¶¶ 116–24.
[69] *See id.* at ¶¶ 125–30.
[70] *See id.* at ¶¶ 131–38.

Finally, Count VI is a claim for unjust enrichment. CoreTel America alleges Oak Point was unjustly enriched "when it caused ARIN to register Oak Point as the owner and/or point of contact of the 162.33.0.0/16 Block" and "by selling and profiting from the sale of the 162.33.0.0/16 Block, either in whole or in part, to a third-party," while CoreTel America was "impoverished by Oak Point's misconduct because Oak Point damaged CoreTel America's business and opportunity to profit from the use, sale, and/or transfer of the 162.33.0.0/16 Block" and "because CoreTel America invested time, money, and resources in the use and maintenance of the 162.33.0.0/16 Block."[71] CoreTel America claims it is entitled to restitution from Oak Point, including disgorgement of Oak Point's profits from its sale of the 162.33.0.0/16 Block.[72]

Oak Point moved to dismiss the Complaint on December 8, 2021 (the "Motion"). The Court heard argument on April 28, 2022 and took the Motion under advisement.[73]

## II. STANDARD OF REVIEW

A party may move to dismiss under this Court's Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[74] In resolving a Rule

---

[71] *See id.* at ¶¶ 139–50.
[72] *Id.* at ¶ 150.
[73] *See* D.I. 25.
[74] Del. Super. Ct. Civ. R. 12(b)(6).

13

12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant; and (4) denies dismissal if recovery on the claim is reasonably conceivable.[75] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[76] Nor must the Court adopt "every strained interpretation of the allegations the plaintiff proposes."[77] Still, even with those cautions in mind, Delaware's pleading standard is "minimal."[78] Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[79]

### III. PARTIES' CONTENTIONS

Oak Point contends each of CoreTel's claims fails under Rule 12(b)(6). First, Oak Point argues the conversion claim should be dismissed because CoreTel America has not demonstrated "superior title to the [162.33.0.0/16 Block], giving it

---

[75] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[76] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).
[77] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).
[78] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).
[79] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility . . . .'").

no property rights . . . for Oak Point to convert."[80]  Oak Point's argument rests on its assertion that "the best evidence of any ownership rights in an IP address is registration of that address with ARIN"[81]—which CoreTel America never secured as to the 162.33.0.0/16 Block.  In opposition, CoreTel America argues Oak Point is inappropriately demanding that CoreTel America definitively prove its claim at the pleading stage.  CoreTel America contends its burden is only to plead factual allegations that would entitle it to relief under a reasonably conceivable set of circumstances, and its allegations supporting its claim of ownership to the 162.33.0.0/16 Block meet that burden.

Second, Oak Point argues the declaratory judgment claim fails for the "same reasons" as the conversion claim: "CoreTel has failed to demonstrate that it or Core Communications obtained a registration right from RCC Debtor at any time for the [162.33.0.0/16 Block]."[82]  Accordingly, Oak Point maintains there is no controversy for the Court to adjudicate.  In response, CoreTel reiterates it adequately pleaded an ownership interest in the 162.33.0.0/16 Block, and a justiciable controversy therefore exists between the parties.

Third, Oak Point argues the common law unfair competition claim should be dismissed because CoreTel "has failed to identify any business relationship with

---

[80] Oak Point's Mot. to Dismiss at 16–17.
[81] *Id.* at 16.
[82] *Id.* at 17.

which Oak Point wrongfully interfered, much less any interference which damaged CoreTel."[83] Specifically, Oak Point contends CoreTel fails to identify (1) "*any specific customers*" for its sale of the 162.33.0.0/16 Block; (2) any "wrongful" behavior by Oak Point; or (3) "any specific damage it suffered as a result of the alleged unfair competition because CoreTel has not identified any current or pending business that it lost as a result of Oak Point's alleged actions."[84] CoreTel answers that: (1) Hilco is the party with whom it expected to have a business relationship; (2) Oak Point acted wrongfully by falsely claiming to own the 162.33.0.0/Block; and (3) CoreTel's injury is the lost opportunity to sell the 162.33.0.0/16 Block under a sale brokered by Hilco.

Fourth, Oak Point argues the DTPA claim is "entirely inapposite and attempts to import a concept from the domain of trademark law into a Complaint which makes no allegations regarding trademarks or trade identification whatsoever, and also suffers the same lack of factual specificity as [CoreTel America's] unfair competition claim."[85] CoreTel America contends Oak Point is wrong to assert the DTPA is concerned solely with trademark law.

Fifth, Oak Point argues the tortious interference claim fails because CoreTel America does not identify any "damaged prospective business relationships which

---

[83] *Id.* at 20.
[84] *Id.* at 19–20.
[85] *Id.* at 21.

resulted from Oak Point's registration of the [162.33.0.0/16 Block]" and because "Oak Point was fully privileged to compete with CoreTel for Hilco's services."[86]  In response, CoreTel America contends neither element of tortious interference is appropriately decided at the pleading stage and that, for now, it has pleaded sufficient facts supporting each element.

Finally, Oak Point argues the unjust enrichment claim fails because CoreTel does not adequately plead a "relation between [Oak Point's] enrichment and [CoreTel America's] impoverishment."[87]  Specifically, CoreTel America "does not allege that CoreTel acted for Oak Point's benefit in any way," which Oak Point says is fatal to the claim.[88]  In response, CoreTel America's argues Oak Point misconstrues what is necessary to allege the relationship between the enrichment and impoverishment and that CoreTel America's factual allegations are sufficient under Delaware law.

## IV. ANALYSIS

For the reasons explained below, CoreTel America has stated claims for conversion (Count I), common law unfair competition (Count II), tortious interference with prospective economic advantage (Count IV), and declaratory judgment (Count V).  CoreTel America fails, however, to state a claim under the

---

[86] *Id.* at 25–26.
[87] *Id.* at 27.
[88] *Id.* at 29.

DTPA (Count III) and for unjust enrichment (Count VI). Accordingly, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

### A. The conversion and declaratory judgment claims survive because the Complaint adequately alleges CoreTel America's property and possessory interests in the 162.33.0.0/16 Block.

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[89] To state a claim for conversion, a plaintiff must allege that: "(1) it had a property interest in equipment or other property; (2) it had a right to possession of the property; and (3) the property was converted."[90]

Oak Point's Motion challenges the first two elements. According to Oak Point, CoreTel America has "no legitimate proof of any ownership rights in the" 162.33.0.0/16 Block because CoreTel America has not pleaded that it entered into a Legacy Rights Services Agreement with ARIN—which Oak Point claims to be "an authoritative indicator of ownership rights to IP addresses."[91] Oak Point contends the complaint instead rests on "[a]llegations of 'operational control' and 'use,'" which "are irrelevant to prove an ownership right in IP addresses."[92]

---

[89] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *22 (Del. Ch. Feb. 28, 2020) (internal citations omitted).

[90] *WNYH, LLC v. AccuMED Corp.*, 2018 WL 2448105, at *10 n.108 (Del. Ch. May 31, 2018) (internal citations omitted).

[91] Oak Point's Mot. to Dismiss at 12.

[92] *Id.* at 15–16.

The Court finds CoreTel America adequately pleaded facts supporting its property interest in, and its right to possess, the 162.33.0.0/16 Block. The relevant factual allegations are: (1) Core Communications entered into an agreement with RCC in November 1999, under which RCC agreed to transfer ownership of the 162.33.0.0/16 Block to Core Communications;[93] (2) shortly thereafter, RCC gave Core Communications "operational control" over the 162.33.0.0/16 Block;[94] (3) Core Communications transferred the 162.33.0.0/16 Block to CoreTel Communications on August 1, 2003, which then transferred the 162.33.0.0/16 Block to CoreTel America;[95] (4) Core Communications and later CoreTel America openly and continuously used the 162.33.0.0/16 Block for business purposes after the alleged agreement with RCC;[96] (5) RCC did not identify the 162.33.0.0/16 Block as one of its assets when it declared bankruptcy;[97] and (6) the Remnant APA did not clearly identify the 162.33.0.0/16 Block as one of the transferred assets.[98]

Oak Point is correct that the emails CoreTel America claims "document" the agreement between Core Communications and RCC are vague in their content and not particularly strong evidence that such an agreement existed. Nevertheless, the conduct of RCC, Core Communications, and CoreTel America following the alleged

---

[93] Compl. at ¶ 39.
[94] *Id.* at ¶ 42.
[95] *Id.* at ¶¶ 45–46.
[96] *Id.* at ¶¶ 44, 47, 69.
[97] *Id.* at ¶¶ 51–57.
[98] *Id.* at ¶ 82.

agreement permits a reasonable inference that CoreTel America in fact acquired ownership of the 162.33.0.0/16 Block from RCC. In particular, RCC's failure to identify the 162.33.0.0/16 Block as one of its assets during the bankruptcy proceedings reasonably could be interpreted as evidence that RCC did not believe it owned that asset anymore.

Oak Point's argument for dismissal rests on its assertion that "the best evidence of any ownership rights in an IP address is registration of that address with ARIN," which CoreTel America has not produced.[99] But CoreTel America does not need to produce at the pleading stage the "best evidence" of its ownership of the 162.33.0.0/16 Block. Instead, CoreTel America only needs to plead facts showing recovery is reasonably conceivable—a "minimal" burden.[100] As explained, CoreTel America satisfies this burden by pleading facts supporting the existence of an alleged agreement between RCC and Core Communications for the transfer of the 162.33.0.0/16 Block. The reasons for CoreTel America's failure to register the 162.33.0.0/16 Block with ARIN are issues better resolved in discovery, after which either the Court or a jury can weigh the significance of CoreTel America's failure to register. At this stage, the Court must credit CoreTel America's allegation that registration with ARIN is immaterial because "ARIN does not have authority over

---

[99] Oak Point's Mot. to Dismiss at 16.
[100] *See Cent. Mortg.*, 27 A.3d at 535–36 (internal citations omitted).

the use, ownership, and transfer of legacy IPv4 addresses,"[101] like those composing the 162.33.0.0/16 Block. CoreTel America's failure to register its ownership of the 162.33.0.0/16 Block does not necessarily establish that CoreTel America does not own it as a matter of law.

Oak Point argues the declaratory judgment claims fails for the "same reasons" as the conversion claim: "CoreTel has failed to demonstrate that it or Core Communications obtained a registration right from RCC Debtor at any time for the [162.33.0.0/16 Block]."[102] For the reasons articulated above, this argument also fails at this stage of the proceedings.

In short, CoreTel America has adequately pleaded facts supporting its property interest in the 162.33.0.0/16 Block and its right to possess the same. Oak Point's arguments to the contrary fail because they demand a level of proof that CoreTel America need not produce at this stage. The Motion therefore is **DENIED** as to the conversion and declaratory judgment claims.

## B. The common law unfair competition claim survives because CoreTel adequately alleges a valuable prospective business relationship.

To state a claim for unfair competition, a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and

---

[101] *Id.* at ¶ 14.
[102] *Id.* at 17.

causes him harm."[103] This cause of action protects prospective business relations that offer potential pecuniary value to a plaintiff, including "the prospect of obtaining employees . . . and any other relations leading to potentially profitable contracts."[104] A "mere perception" of a prospective business relationship, however, does not amount to a "*bona fide* expectancy."[105]

Here, Oak Point argues the unfair competition claim must be dismissed because (1) CoreTel America does not "identify any counterparty to an expected business relationship with which Oak Point supposedly interfered," and (2) CoreTel America "failed to plead any specific damage it suffered as a result of the alleged unfair competition because CoreTel [America] has not identified any current or pending business that it lost as a result of Oak Point's alleged actions."[106] Both arguments fail.

First, Oak Point's contention that a plaintiff must be able to identify "with sufficient particularity the counterparties to the expected business relationship" overstates the pleading requirements of Delaware law.[107] Oak Point's sole support for this proposition is an open-ended citation to *Agilent Technologies, Inc. v.*

---

[103] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (internal citations omitted).
[104] *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1285 (Del. Super. Ct. 2001) (internal citations omitted).
[105] *Id.* (internal citations omitted).
[106] Oak Point's Mot. to Dismiss at 19–20.
[107] *Id.* at 19.

*Kirkland*.[108] But the *Agilent* court held: "Agilent has cited cases indicating that the specific party is generally identified by name, but these cases do not suggest that the specific party *must* be identified. In fact, in one of the cases Agilent cites, *Kelly-Springfield*, . . . the court accepted allegations of both named and unnamed prospective business relations."[109] In a later case, citing *Agilent*, this Court held a plaintiff "does not need to name the specific party but must be descriptive enough 'to support a claim that specific prospective business relations existed.'"[110] CoreTel America's averment that it expected to enter a business relationship with Hilco to sell the 162.33.0.0/16 Block satisfies this element, even though CoreTel America does not identify who, exactly, would have purchased the Block. In any case, CoreTel has pleaded that the scarcity of certain kinds of IP addresses has created an active market for their purchase and sale. It therefore reasonably can be assumed that Hilco would have been able to find a buyer for the 162.33.0.0/16 Block on CoreTel America's behalf. Additional support for this conclusion lies in CoreTel America's allegation that Oak Point did in fact find a buyer for the 162.33.0.0/16 Block. Accordingly, CoreTel America has adequately pleaded facts "descriptive enough 'to support a claim that specific prospective business relations existed.'"[111]

---

[108] 2009 WL 119865 (Del. Ch. Jan. 20, 2009) (internal citations omitted).

[109] *Id.* at *7; *see also Kelly-Springfield Tire Co. v. D'Ambro*, 408 Pa. Super. 301 A.2d 867 (Pa. Super. 1991).

[110] *IronRock Energy Corp. v. Pointe LNG, LLC*, 2021 WL 3503807, at *5 (Del. Super. Ct. July 19, 2021) (internal citations omitted).

[111] *Id.* at *5 (internal citations omitted).

23

Second, Oak Point argues CoreTel does not adequately plead it suffered damage as a result of the alleged wrongful interference. To properly plead damages, however, a plaintiff need only plead facts that conceivably support an inference of commercial harm.[112] "There is no requirement that a business relationship be definitively terminated for there to be inference. Rather, wrongful conduct is 'unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue.'"[113] Here, CoreTel alleges (i) it had a reasonable expectancy of entering a business relationship with Hilco under which Hilco would broker a sale of the 162.33.0.0/16 Block on CoreTel's behalf, and (ii) Oak Point "falsely represented that it had an ownership interest in the 162.33.0.0/16 Block."[114] CoreTel avers Oak Point's misrepresentation caused Hilco to switch its focus to attempting to broker a deal under which CoreTel would buy what it already owned.[115] These allegations permit a reasonable inference that Oak Point's alleged interference "prevented [CoreTel America] from legitimately earning revenue." CoreTel therefore has adequately pleaded an injury, and the Motion is **DENIED** as to the common law unfair competition claim.

---

[112] *See Agilent*, 2009 WL 119865, at *9.
[113] *Id.*
[114] Compl. at ¶ 111.
[115] *Id.* at ¶ 88.

24

**C. The DTPA claim fails as a matter of law because CoreTel fails to identify any patterns of deceptive conduct.**

Count III is a claim under the Delaware Deceptive Trade Practices Act. The DTPA prohibits engaging in a "deceptive trade practice . . . in the course of a business, vocation, or occupation."[116] Because the DTPA is intended to prevent patterns of deceptive conduct, rather than isolated incidents, relief under the DTPA depends on the availability of injunctive relief.[117] "A claim for injunctive relief must be supported by the allegation of facts that create a reasonable apprehension of a future wrong."[118]

In its opening brief, Oak Point argued in passing that the DTPA is intended "to prevent patterns of deceptive conduct instead of isolated incidents of misconduct."[119] But Oak Point focused its argument for dismissal on the theory that the DTPA is an extension of trademark law and the complaint "makes no allegations regarding trademarks or trade identification . . . ."[120]

Oak Point's foray into trademark law is unnecessary. The essential defect with CoreTel America's DTPA claim is that "the alleged wrongdoing"—*i.e.*, Oak

---

[116] 6 *Del. C.* § 2532.

[117] *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, 2022 WL 911253, at *4 (D. Del. Mar. 28, 2022) (quoting *Wright v. Portfolio Recovery Affiliates*, 2011 WL 1226115, at *5 (D. Del. Mar. 30, 2011)); *see also EDIX Media Gp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006) ("The DTPA was designed to prevent patterns of deceptive conduct, not isolated incidents.") (internal citations omitted); *Agilent*, 2009 WL 119865, at *10.

[118] *Agilent*, 2009 WL 119865, at *10 (internal citations omitted).

[119] Oak Point's Mot. to Dismiss at 21 (citing *Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975)).

[120] *Id.* at 21.

Point's conduct in asserting an ownership interest in the 162.33.0.0/16 Block and then selling it to a third party—"is in the past."[121] The claim is concerned with an isolated incident of misconduct and not any ongoing practices of Oak Point. Furthermore, relief under the DTPA is dependent on a plaintiff's entitlement to injunctive relief. But CoreTel America pleads no facts supporting a reasonable apprehension of a future wrong against it, and this Court does not have jurisdiction to grant this relief. Simply put, the DTPA was not intended to cover disputes regarding isolated instances of conduct. The Motion therefore is **GRANTED** as to the DTPA claim.

### D. CoreTel America adequately pleads a tortious interference with prospective economic advantage claim.

Count IV is a claim for tortious interference with prospective economic advantage. "To survive dismissal, a claim for tortious interference with business relations must allege: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages.'"[122] The Court must consider these elements "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[123] To defeat the defendant's competition privilege, the plaintiff

---

[121] *Registered Agent Solutions*, 2022 WL 911253, at *6.
[122] *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001)
[123] *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *19 (Del. Super. Ct. June 24, 2021) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)).

must plead that the defendant's conduct was wrongful independent of the interference.[124]

Here, Oak Point contends CoreTel "has not identified any potential business relationships that were damaged as a result of Oak Point's conduct, nor does it make any allegations that Oak Point was not fully privileged to contract with Hilco or compete with CoreTel."[125] The Court disagrees. The existence of a reasonably probable business expectancy is a "question of fact not suitable for resolution [on a motion to dismiss]."[126] Similarly, justification defenses "present fact-intensive inquiries that are typically not appropriate for disposition on a motion to dismiss."[127] At least at this stage, CoreTel has adequately pleaded facts to support each of these two elements.

### 1. Reasonably probable prospective business relationship

Prospective business relationships are "by definition, not as susceptible of definite, exacting identification as is the case with an existing contract."[128] Recognizing this distinction, Delaware courts "permit[] a broad range of legitimate business expectancies, including the 'prospect of . . . [any] relations leading to

---

[124] *Id.* (internal citations omitted).
[125] Oak Point's Mot. to Dismiss at 27.
[126] *IronRock*, 2021 WL 3503807, at *5.
[127] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, *12 (Del. Ch. Sept. 22, 2016).
[128] *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, 2015 WL 6772638, at *7 (Del. Super. Ct. Nov. 2, 2015) (internal citation omitted).

potentially profitable contracts.'"[129]   It is required, however, that the factual allegations establish some basis of "a *bona fide* expectancy."[130]   The "mere perception" of a prospective relationship or contract will not suffice.[131]   "To be reasonably probable, a business opportunity must be 'something more than a mere hope or the innate optimism of the salesman.'"[132]

The Court finds CoreTel America has pleaded facts supporting the reasonable probability of a business opportunity.  CoreTel America alleged it retained Hilco as its broker to sell IP addresses in 2015 and, in January 2017, "approached Hilco about selling at least a portion of the 162.33.0.0/16 Block."[133]  CoreTel America ultimately "decided to wait for three years—until 2020—to sell the 162.33.0.0/16 Block in case another party asserted a claim to the 162.33.0.0/16 Block in the intervening time."[134]  CoreTel America does not expressly allege it informed Hilco of its intention to delay the sale for three years.  Still, Mr. Hazan followed up with CoreTel America about three years later, in May 2020: "I believe it has been a while since we have sold space for you.  I know you had discussed the sale of this /16 [sic] some time ago.

---

[129] *Id.* (internal citation omitted).
[130] *Id.* (internal citation omitted).
[131] *Id.* (internal citation omitted).
[132] *Id.* (internal citation omitted).
[133] Compl. at ¶¶ 72–73.
[134] *Id.* at ¶ 74.

Something came our way recently regarding that block and I would like to speak to you about it when you have a few minutes."[135]

CoreTel America's factual allegations regarding its business relationship with Hilco are not particularly detailed. Nevertheless, the fact that Hilco previously brokered sales for CoreTel America and knew CoreTel America was interested in arranging a sale of the 162.33.0.0/16 Block at some point supports a conclusion that such a business opportunity between them was reasonably probable. In other words, CoreTel America has said enough at the pleading stage to establish "something more than a mere hope or the innate optimism of the salesman or a mere perception of a prospective business relationship."[136] Thus, CoreTel America's factual allegations are sufficient to survive dismissal.

### 2. Justification

"To meet the intentional interference prong, a plaintiff must prove that the defendant's interference with the plaintiff's business opportunity was intentional and wrongful or improper."[137] "An alleged interference in a prospective business relationship is only actionable if it is wrongful."[138] To defeat the defendant's privilege to compete, the defendant's conduct must be "wrongful independent of the

---

[135] *Id.* at ¶ 89.
[136] *Agilent*, 2009 WL 119865, at *7.
[137] *IronRock*, 2021 WL 3503807, at *6 (internal citations omitted).
[138] *Id.* (internal citation omitted).

interference."[139] Wrongful conduct defeating the privilege to compete includes "[f]raudulent misrepresentations"—that is, a statement that "to the knowledge or belief of its utterer . . . is false in the sense in which it is intended to be understood by its recipient."[140] A fraudulent representation may subject a defendant to liability even when it "is not of such a character as to subject him to liability for . . . other torts."[141] "To prove fraudulent intent, 'a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth.'"[142]

Here, CoreTel America alleges Oak Point interfered in its relationship with Hilco by falsely claiming to own the 162.33.0.0/16 Block in its statements to ARIN and Hilco.[143] CoreTel America does not expressly plead that Oak Point's claim of ownership was fraudulent. Nevertheless, certain factual allegations could support a reasonable inference that Oak Point acted with at least reckless indifference to the truth. For example, the Remnant APA through which Oak Point purported to acquire the 162.33.0.0/16 Block "does not identify the 162.33.0.0/16 Block as a Remnant Asset that Oak Point purchased from the Liquidating Trust."[144] Instead, the APA described the purchased assets "only in general terms."[145] The APA's silence as to

---

[139] *Id.* (internal citation omitted).
[140] *Id.* (internal citation omitted).
[141] *Id.* (internal citation omitted).
[142] *Id.* (internal citation omitted).
[143] Compl. at ¶¶ 87–88, 90, 128–29.
[144] *Id.* at ¶ 82.
[145] *Id.* at ¶ 83.

the 162.33.0.0/16 Block is particularly noteworthy given CoreTel America's allegation that the 162.330.0/16 Block was worth at least $3 million[146]—one reasonably would expect an asset of such value to be identified with more specificity. Moreover, Oak Point apparently persisted in claiming to own the 162.33.0.0/16 Block even after CoreTel America advised Oak Point of its competing claim.[147] Taken together, these factual allegations permit a reasonable inference that Oak Point sold the 162.33.0.0/16 Block despite receiving notice of a non-frivolous dispute as to its ownership.

When these pleadings are accepted as true and construed in CoreTel America's favor, it is reasonable to infer that Oak Point acted wrongfully or improperly by selling the 162.33.0.0/16 Block despite evidence that it had not actually acquired it. As with the previous element, CoreTel America's allegations satisfy Delaware's minimal pleading standard. Accordingly, the Motion is **DENIED** as to the tortious interference claim.

### E. The unjust enrichment claim fails as a matter of law.

Count VI is a claim for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good

---

[146] *Id.* at ¶ 25.
[147] *See id.* at ¶ 79.

31

conscience."[148] To state a claim for unjust enrichment, a plaintiff must allege: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[149] Here, Oak Point contends CoreTel does not adequately plead a relationship between the enrichment and impoverishment.

Oak Point is correct. The general rule is that the "plaintiff must show that there is 'some direct relationship . . . between a defendant's enrichment and a plaintiff's impoverishment.' In other words, there must '[a] showing that the defendant was enriched unjustly by the plaintiff who acted for the defendant's benefit."[150] CoreTel America pleads no facts suggesting Oak Point was enriched unjustly *by* CoreTel America or CoreTel America ever acted for Oak Point's benefit. Instead, CoreTel America alleges only that "Oak Point's unjust enrichment is related to the impoverishment that CoreTel America has suffered because Oak Point's misconduct has robbed CoreTel America of its right to use the 162.33.0.0/16 Block to service customers and/or to sell, license, transfer or otherwise dispose of the 162.33.0.0/16 Block for a profit."[151] These factual allegations do not sound in unjust enrichment, but rather in conversion: "any distinct act of dominion wrongfully

---

[148] *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).
[149] *Id.*
[150] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59–60 (Del. Ch. 2012) (internal citations omitted).
[151] Compl. at ¶ 145.

exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[152]

CoreTel America argues the relationship element of unjust enrichment is not so demanding; citing *Lyons Ins. Agency v. Kirtley*, CoreTel America claims all that is necessary is a "simple relationship between the plaintiff's impoverishment and defendants' enrichment."[153] But *Lyons* explained that standard applies in situations where "a nonparty to a contract knowingly facilitates prohibited activities."[154] In *Lyons*, for example, an insurance agency entered into an employment contract with one of its sales agents. Under the contract, the agent agreed to pay his agency in the event he began working for a different employer and took his clients with him. The agent later began for working for a new agency and brought his pre-existing clients with him, but failed to pay the previous agency. The previous agency claimed the new agency was liable for unjust enrichment because the new agency allegedly used the agent's confidential information for its own benefit despite knowing the agent was prohibited from using that information. Under those circumstances, the court held the initial agency adequately pleaded a relationship between its impoverishment and the new agency's enrichment. In short, *Lyons* sets out a circumstance in which

---

[152] *Drug, Inc. v. Hunt*, 168 A. 87, 93 (1933) (internal citations omitted).
[153] *See* CoreTel America's Answering Br. at 32–33 (quoting *Lyons Ins. Agency, Inc. v. Kirtley*, 2019 WL 1244605, at *3 (Del. Super. Ct. Mar. 18, 2019)).
[154] *Lyons*, 2019 WL 1244605, at *3.

33

an unjust enrichment claim may be brought against nonparties to a contract who knowingly facilitate and benefit from the breach of a party to the contract.[155]

The facts of the current case are distinguishable from *Lyons*. CoreTel America does not allege Oak Point knowingly facilitated prohibited activities under any contract. Instead, CoreTel America simply alleges Oak Point should not be allowed to keep the proceeds from the sale of property it did not own. CoreTel America's allegations support its conversion claim, as previously discussed, but CoreTel America has not pleaded the sort of relationship necessary to sustain an unjust enrichment claim. The Motion therefore is **GRANTED** as to that claim.

## V. CONCLUSION

The Motion is **GRANTED** as to the DTPA claim (Count III) and the unjust enrichment claim (Count VI). The Motion is **DENIED** as to the conversion claim (Count I), the common law unfair competition claim (Count II), the tortious interference claim (Count IV), and the declaratory judgment claim (Count V).

---

[155] *See id.*; *see also Rei Holdings, LLC v. LienClear - 0001*, 2020 WL 6544635, *11 (D. Del. Nov. 6, 2020) (applying the same test where the plaintiff pleaded nonparties to a contract "knowingly facilitated prohibited activities").